UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
STEEL RIVER SYSTEMS, LLC,

              Plaintiff,

       - against –

VARIANT ALTERNATIVE INCOME FUND, PIER
SPECIAL OPPORTUNITIES FUND, LP, and
GREENHILL DEBT MANAGEMENT, LLP,

              Defendants.

----------------------------------------X

**MEMORANDUM AND ORDER**

24 Civ. 8676 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Steel River Systems, LLC ("Steel River") filed this action against defendants Variant Alternative Income Fund ("Variant"), Pier Special Opportunities Fund, LP ("Pier"), and Greenhill Debt Management, LLP ("Greenhill") (together, "defendants") on November 14, 2024. ECF No. 1 ("Compl."). The next day, Steel River filed an emergency motion seeking a temporary restraining order ("TRO") and injunctive relief in connection with Variant's planned sale of plaintiff's assets under the Uniform Commercial Code ("UCC"), contending that the sale was unlawful because it arose from, and would further defendants' collection of, usurious and illegal loans. ECF Nos. 3-5. Shortly thereafter, Variant filed a letter agreeing to halt the sale pending resolution of plaintiff's claims. ECF No. 18. After holding a conference

with the parties, the Court issued an Order denying plaintiff's motion for a TRO as moot, but deferring a decision on plaintiff's motion for a preliminary injunction pending further briefing from the parties.  ECF No. 27.

Now pending before this Court are: (1) defendant's motion to dismiss plaintiff's complaint, ECF Nos. 41-43; and (2) plaintiff's motion for a preliminary injunction enjoining Variant from issuing any additional UCC actions during the pendency of this case, ECF Nos. 3-5.

**BACKGROUND**[1]

## I.    Factual Background

Steel River is a limited liability company specializing in debt collection, debt purchasing, and master account servicing. Compl. ¶ 1.  In March 2022, Greenhill, which acts as an intermediary between lenders and borrowers in the credit and collection industry, approached Steel River with an offer to facilitate a deal.  Id. ¶¶ 9-10.  Under the proposed arrangement,

---

[1]    The relevant facts are drawn from the complaint, Compl., the exhibits attached thereto, Compl., Exs. A-C, and the documentary evidence submitted in connection with plaintiff's motion for a preliminary injunction, ECF No. 5, Exs. 1-4.  See Mullins v. City of New York, 626 F.3d 47, 52 (2d Cir. 2010) (holding that a court may rely on affidavits, depositions, sworn testimony, and hearsay evidence in considering a motion for a preliminary injunction).  For the purposes of the instant motion to dismiss, all nonconclusory allegations are accepted as true, Matson v. Bd. of Educ. of City School Dist. of N.Y., 631 F.3d 57, 63 (2d Cir. 2011), and the Court draws all reasonable inferences in plaintiff's favor, Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012).

Variant, a private equity firm and lender, and Pier, a hedge fund and responsive liquidity provider, would lend funds to Steel River to enable it to purchase additional debt portfolios from creditors or secondary sellers. Id. ¶¶ 9-13, 16, 20-23. Steel River would own the receivables and serve as the master servicer in collecting the debts, and Greenhill would serve as the "Manager" of the agreement. Id. ¶¶ 17-18.

Before entering into an agreement, the parties shared projections estimating the total amounts that would be collected on the various purchased portfolios. Id. ¶ 34. All projections estimated that Variant and Pier would receive collections totaling more than 25% of the loan principal for every loan. Id. ¶ 35.

On December 22, 2022, the parties entered into a Loan and Servicing Agreement and related promissory note for $2,418,797.84, both of which mirrored the structure proposed by Greenhill. Id. ¶¶ 19, 32; see Compl., Ex. A at 1-150.[2] The promissory note had a stated maturity date of December 22, 2024, and provided for a

---

[2] This Agreement contains a forum selection clause, which provides:

> Any legal action or proceeding with respect to any Loan Document shall be brought exclusively in the courts of the State of New York located in the City of New York, or of the United States of America for the Southern District of New York and, by execution and delivery of this Agreement, each party hereto executing this Agreement hereby accepts for itself and in respect of its property, generally and unconditionally the jurisdiction of the aforesaid courts[.]

Loan Agreement § 12.14.

preferred return to Variant and Pier of 115% of the initial principal amount, due 18 months from the funding date of December 22, 2022.  See Compl., Ex. A at 2-6 ("Promissory Note dated Dec. 22, 2022").  The promissory note also provided for servicing fees payable to Steel River, consisting of a percentage of the gross collections from the Financed Accounts purchased with the note proceeds, which would continue until the stated maturity date. Id. at 6.[3]  The parties agreed that each future loan made under this Loan and Servicing Agreement would be secured by a similar promissory note (collectively, with the Loan and Servicing Agreement, the "Agreement").  Id. ¶¶ 22-24.

The parties ultimately executed eight promissory notes under the Agreement between approximately December 22, 2022 and January 12, 2024, with Variant and Pier loaning Steel River a total of $5,617,550.75 during that period.[4]  See Compl., Ex. A at 1-14, 151-84.  See below:

---

[3]    The servicing fees listed in Schedule 1 to the promissory note dated Dec. 22, 2022 vary, initially ranging from between 25-55% of all gross collections for the various types of debt in the purchased accounts.  See Promissory Note dated Dec. 22, 2022 at 6.  The servicing fees subsequently increased to up to 57.5% of all Gross Collections.  Id.

[4]    Exhibit A to the Complaint is incomplete, as it includes only six of the eight promissory notes executed pursuant to the Agreement, and only three of those promissory notes include the relevant Schedule A.  See Ex. A at 1-14, 151-84.  However, it appears that the parties executed the eight promissory notes over a period of approximately 13 months, including on: December 22, 2022 (4801); January 13, 2023 (6001); October 5, 2023 (4901); October 9, 2023 (4802); and January 12, 2024 (4803 and 4902).  Id. at 1, 11, 85, 151, 165, 179.

| Promissory Note | Amount |
|---|---|
| 4801 | $2,418,797.84 |
| 4802 | $716,741.87 |
| 4803 | $615,213.12 |
| 4804 | $373,843.79 |
| 4805 | $114,439.21 |
| 6001 | $592,361.63 |
| 4901 | $533,819.88 |
| 4902 | $252,333.41 |
| **Total Amount** | **$5,617,550.75** |

Under the Agreement, all collections on debt portfolios purchased with loan proceeds would be directed to a collection account designated by Steel River. Compl. ¶ 25. Every two weeks, either Steel River or Greenhill, as Manager, would distribute the gross collections[5] as follows:

(i)    <u>First</u>, to pay all <u>Servicing Fees</u> [to Steel River][6] and invoiced <u>Collection Fees</u> [to any third-party collection agency or other third-party service provider][7] relating to such Loan for the proceeding Collection Period;

(ii)    <u>Second</u>, to any third-party Replacement Servicer or administrator, including any Collateral Administrator, <u>all properly invoiced fees and</u>

---

[5]    "Collections" are "all amounts received in the Collection Account in respect of Financed Accounts or other Collateral for a Loan. Compl., Ex. A at 15-102 ("Loan Agreement") § 1.1.

[6]    "Servicing Fees" are "the servicing fees payable to [Steel River, as Servicer] for servicing each Portfolio of Financed Accounts purchased with proceeds of a Loan . . ., the amount thereof being determined in accordance with Schedule 1 to the Note[.]" Loan Agreement § 1.1. As stated <u>supra</u> at 4, n.3, these fees generally ranged from 25% to 57.5% of the Gross Collections.

[7]    "Collection Fees" are "all fees and expenses due to any third-party collection agency or other third-party service provider in connection with the collection of or realization on Financed Accounts, which . . . shall not include Manager Fees or Servicing Fees." Loan Agreement § 1.1.

<u>expenses</u> relating to servicing, collection, custody and administration of the Financed Accounts or the Collateral (including bank fees) then due;

(iii)    <u>Third</u>, to [Variant] for its benefit, an amount equal to <u>all unpaid fees, costs and expenses, including attorneys' fees</u>, to which [Variant] is entitled under this Loan Agreement or any other Loan Document, other than Due Diligence Expenses; and

(iv)    <u>Fourth</u>:

(A)    2.5% of the Gross Collections to [Variant] for its benefit to pay <u>Due Diligence Expenses</u>[8] and (ii) 2.5% of the Gross Collections to [Greenhill] to pay <u>Manager Fees</u> [totaling 5% of Gross Receipts][9] . . . , until all Due Diligence Expenses are paid in full, and <u>thereafter 5% of Gross Collections to [Greenhill]</u>; and

(B)    the remaining Collections to [Variant] for the benefit of the Lenders in respect of such Loan until the <u>Preferred Return</u> [115% of the loan principal] is paid in full; provided, however that (1) upon and after receipt by [Variant] of the Preferred Return and until the Stated Termination Date, all remaining Collections under this

---

[8]    "Due Diligence Expenses" are "the aggregate amount of out-of-pocket cost and expenses associated with the evaluation and assessment of the transactions contemplated under the Agreement and the Loans and the financing provided . . ., including legal fees for documentation and legal due diligence . . ., background checks, operational audits, business due diligence, lien searches and other customary costs and expenses, all to the extent (a) incurred by [Variant] or the Lenders on or prior to the Closing Date in connection with the initial Portfolio purchase hereunder and in an aggregate amount not in excess of $100,000.00 and (b) consisting of Carryover Expenses." Loan Agreement § 1.1. "Carryover Expenses" are "certain unpaid due diligence expenses incurred by [Variant] in connection with receivables purchase arrangements with [Greenhill], as set forth in a written notice to [Greenhill] from [Variant]." <u>Id.</u>

[9]    "Manager Fees" means "5% of Gross Receipts." Loan Agreement § 1.1.

> clause (iv) shall be paid (y) <u>75% to [Variant] for the benefit of the Lenders in respect of the Additional Preferred Return</u> and (z) <u>25% to [Greenhill] in respect of the Additional Manager Fee</u>, in each case until the Stated Maturity Date and (2) upon and after the Stated Maturity Date with respect to such Loan, all remaining Collections under this clause (iii) shall be paid to [Greenhill] for distribution in accordance with the Servicer Origination Agreement,[10] or as otherwise required by any court or other Governmental Authority.

Loan Agreement § 3.3 (emphasis added). The sums owed under the Agreement were also secured by a Collateral Assignment Agreement, <u>id.</u> ¶ 31; Compl., Ex. A., at 98-102 ("Collateral Assignment"), which granted Variant the right to enforce its security rights, Collateral Assignment ¶ 3.

In August 2024, Steel River contacted Variant to negotiate a prepayment or restructuring of the Agreement, expressing concern that it might no longer be able to operate under its terms. <u>Id.</u> ¶¶ 36-37. Steel River advised that it had "lost a major contract . . . which subsidized its debt purchasing and collection operations" and would "no longer be able to maintain such operations[,]" and that it "ha[d] only obtained approximately 1% of the underlying account media with respect to one of the largest

---

[10]   The "Servicer Origination Agreement" is "each agreement between Servicer and Manager as to the origination of a Portfolio of Accounts, certain compensation relating thereto and the collection of Financed Accounts held in such Portfolio[.]" Loan Agreement § 1.1.

account customers under the Portfolio[,]" "significantly devalu[ing] . . . the Portfolio[.]" Compl., Ex. C at 2-3. Steel River offered to prepay a total of $2,801,570.59, stating that this amount represented "the outstanding Loans and other amounts due under" the Agreement, in addition to an 8% premium. Compl., Ex. C at 2.

On September 3, 2024, Variant sent a letter to Steel River providing "formal notice of the occurrence of certain Events of Default under" Sections 10.1(b)[11] and 10.1(g)[12] of the Agreement. Id. Ex. C at 2-3. Variant also declined Steel River's prepayment offer, advising that "no prepayment of the Loans as contemplated . . . [was] permitted without the agreement of" Variant and Pier. Id. at 2.[13] Variant suggested that it would be willing to permit

---

[11] Section 10.1 of the Agreement lists certain events constituting an "Event of Default" under the Loan Agreement. Loan Agreement § 10.1. Section 10.1(b) states that an event of default includes: "[a]ny representation or warranty made by any Borrower, Manager, Servicer or a Guarantor . . . [that] shall prove to be false, misleading, incomplete or untrue in any material respect . . . as of the date on which such representation or warranty is made or deemed to be made or at any time thereafter so long as it shall continue in full force and effect." Loan Agreement § 10.1(b).

[12] Section 10.1(g) states that an event of default includes "[a]ny Material Adverse Effect[.]" Loan Agreement § 10.1(g). A "Material Adverse Effect" is defined as: "any circumstance, event, condition, fact, occurrence, event, change or other matter that has or would reasonably be expected . . . to have a material adverse effect on (a) the condition (financial or otherwise), operations, business, prospects, management or assets of [Steel River], (b) the ability of [Steel River] to perform its obligations under the Loan Documents, or (c) the ability of [Variant] or the Lenders to enforce any of the Loan Documents." Loan Agreement § 1.1.

[13] Notably, the Agreement explicitly stated that Steel River could not "pay or prepay any Loan in whole or in part other than from Net Collections during

Steel River to pay "an all-in prepayment amount of $6,330,760.00[,]" which would compensate defendants for "all principal, interest, Preferred Returns and Additional Preferred Returns[.]" Id. Ex. C at 4. Finally, Variant notified Steel River that it intended to appoint a replacement servicer for the portfolio accounts. Id. Ex. C at 5.

A little over one month later, Variant filed a UCC statement against Steel River seeking to encumber certain of its assets, including all "accounts . . . financed or refinanced, directly or indirectly, with the proceeds of any loan[.]" Compl. ¶ 59. On October 21, 2024, Variant gave notice of its intent to dispose of the Agreement collateral pursuant to its rights under the UCC, issuing a Notice of Public Sale scheduled to occur via Zoom on November 21, 2024 at 11:00 a.m. ET. Id. ¶¶ 60-61, Ex. B. The notice stated Steel River's total amount of indebtedness as $4,467,100.[14] Compl., Ex. B.

On November 7, 2024, Variant sent a letter to Steel River demanding $5,008,769, stating that this amount represented

---

the Collection Period and in accordance with this Agreement." Loan Agreement § 3.5.

[14]    The Notice stated that this amount represented the total purchase cost of the loan portfolio ($6,038,959), plus the 115% Preferred Return (together, totaling $6,944,803) and $49,000 in attorney's fees (all together, totaling $6,993,803), less the distributions paid to date (totaling $2,526,703). Compl. ¶ 61, Ex. B at 3.

"outstanding principal and accrued expected returns as of October 31, 2024, with incremental daily interest accruing at $1,435.96 for each day thereafter until repayment[.]" Id. ¶ 62.

## II.  Procedural Background

One week later, on November 14, 2024, Steel River filed the currently pending complaint asserting causes of action against Variant, Pier, and Greenhill under New York UCC § 9-625(a) and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 et seq., and requesting declaratory relief pursuant to 28 U.S.C. § 2201. Id. ¶¶ 64-115. Specifically, Steel River alleged that defendants failed to act in accordance with Article 9 of New York's UCC because the loans at issue charged interest at a rate that violated New York's criminal usury cap, id. ¶¶ 103, 107, and requested that the Court issue an order "declaring Variant's UCC filing to be void and of no effect due to the usurious nature of the loans," id. ¶ 115.

The next day, Steel River filed an emergency motion seeking a TRO and preliminary injunction to enjoin defendants from proceeding with the public sale scheduled for November 21, 2024. ECF Nos. 3-4.  Steel River also filed an attorney declaration attaching: a copy of the complaint; a copy of the loan servicing agreement; a copy of Variant's September 3, 2024 letter to Steel

-10-

River; and a copy of Variant's Notice of Auction.  ECF No. 5.[15]

On November 19, 2024, defendant Variant filed a letter advising

that it would voluntarily halt the sale pending resolution of the

injunction motion.  ECF No. 18.  Accordingly, in an Order dated

November 21, 2024, the Court denied plaintiff's request for a TRO

as moot.  ECF No. 27.

Variant subsequently filed an opposition to Steel River's

motion for a preliminary injunction, ECF No. 39, with an

accompanying declaration by Curt Fintel, a principal of Variant

Investments, LLC, attaching six additional exhibits, ECF No. 40.[16]

---

[15]    Steel River also filed a motion to seal the Agreement.  ECF Nos. 7-8.
Neither Variant nor Pier objected to the motion, ECF Nos. 30, 48, and Greenhill
submitted a letter requesting that the loan documents be filed "with appropriate
redactions in lieu of sealing," ECF No. 30.  Accordingly, Steel River's request
to seal is granted, subject to the disclosure of certain portions of the
Agreement cited herein.

[16]    Variant Investments, LLC is not a defendant to this action.  The
declaration states that Variant Investments, LLC "serves as the investment
adviser to defendant [Variant] and is generally responsible for the operation,
management and investment of Variant's assets."  ECF No. 40 at 1.

The exhibits attached to the Fintel Declaration are: (1) an email chain
involving employees at Steel River and Greenhill, in which Steel River shared
projections, ECF No. 40-1; (2) a Deposit Account Control Agreement by and among
Greenhill, Variant, and Flagstar Bank, N.A., dated July 18, 2024, ECF No. 40-
2; (3) a Manager Performance Assessment regarding Steel River, produced by
Greenhill, dated August 21, 2024, ECF No. 40-3; (4) an Offer Memorandum from
Steel River, dated August 24, 2024, in which Steel River offered to pay "the
remaining principal balance . . . plus a premium of 8% on the outstanding
principal[,]" ECF No. 40-4; (5) a letter from Variant to Steel River, dated
October 21, 2024, advising that it would be terminating Steel River as Servicer
under the Agreement, ECF No. 40-5; and (6) a graph titled, "Cumulative Interest
Paid Over 48 Months – 4801 Portfolio[,]" ECF No. 40-6.

The parties disagree as to whether the Fintel Declaration and its exhibits
may properly be considered in resolving the pending motions.  See ECF No. 51,
7-8; ECF No. 56 at 5-6.  Because the Court does not rely on the Fintel

Variant also filed a motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 9(b), 12(b)(1), and 12(b)(6), ECF Nos. 41-42, with an accompanying declaration by Fintel attaching the same six exhibits provided in support of its opposition to Steel River's motion for a preliminary injunction, ECF No. 43.  Steel River opposed Variant's motion to dismiss, ECF No. 51, and submitted a reply brief in support of its motion for a preliminary injunction, ECF No. 52.  Variant's motion to dismiss was fully briefed on February 4, 2025.  ECF No. 56.  Defendants Greenhill and Pier joined Variant's opposition to Steel River's motion for a preliminary injunction and Variant's motion to dismiss the Complaint.  See ECF Nos. 45, 49, 54.

## DISCUSSION

### I.  Motion to Dismiss

We first resolve Variant's motion to dismiss before evaluating Steel River's motion for a preliminary injunction.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must include "enough facts to state a claim that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable

---

Declaration or its exhibits in the below analysis, we need not resolve the issue of whether it may properly be considered.

inference that the defendant is liable for the misconduct alleged."
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A court must accept
as true all factual allegations in the complaint and draw all
reasonable inferences in plaintiff's favor.  Acticon AG v. China
N.E. Petrol. Holdings Ltd., 692 F.3d 34, 37 (2d Cir. 2012).  In
evaluating the sufficiency of a complaint, "a district court may
consider the facts alleged in the complaint, documents attached to
the complaint as exhibits, and documents incorporated by reference
in the complaint."  DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104,
111 (2d Cir. 2010).

### a. The UCC Claim

We begin by addressing plaintiff's claim under Section 9-
625(a) of the N.Y. U.C.C.  Compl. ¶¶ 100-07.  Section 9-625(a) of
the New York U.C.C. "permits a debtor to seek an injunction to
prevent a secured party from enforcing its security interest in a
manner that is inconsistent with the statute."  DAOL Rexmark Union
Station LLC v. Union Station Sole Member, LLC, 772 F. Supp. 3d
373, 408 (S.D.N.Y. 2025) (citing N.Y. U.C.C. § 9-625(a)).  "If it
is established that a secured party is not proceeding in accordance
with [Article 9], a court may order or restrain collection,
enforcement, or disposition of collateral on appropriate terms and
conditions."  N.Y. U.C.C. § 9-625(a).

Plaintiff alleges that defendants Variant and Pier are "proceeding in a manner that is not in accordance with Article 9" of the UCC because, plaintiff argues, the loans at issue charge interest at a rate in excess of 25%, in violation of New York's criminal usury cap, and, accordingly, are void ab initio. Compl. ¶¶ 102-03. Defendants dispute this assertion, contending instead that "[t]he vast majority of what [Steel River] claims is the 'total amount owed to lender' is comprised of . . . non-performing receivables [that] are nothing but uncertain, contingent collections and cash flows, and are not guaranteed or even likely to be collected or paid to the Lenders and, as a result do not constitute interest for usury purposes[.]" ECF No. 42 ("Mot.") at 6-7. We agree.

Under New York law, a loan contract is criminally usurious if it provides for an annual interest rate of 25% or more. N.Y. Penal Law § 190.40.[17] However, New York's usury laws "apply only to payments properly characterized as 'interest.'" Blue Citi, LLC v. 5Barz Int'l Inc., 338 F. Supp. 3d 326, 335 (S.D.N.Y. 2018) (citations omitted). "Interest is, by definition, a payment made with a degree of certainty and regularity[.]" Id.

---

[17]    A corporate borrower may raise the defense of "criminal usury" in a civil action. Adar Bays, LLC v. GeneSYS ID, Inc., 37 N.Y.3d 320, 326-27 (2021).

Plaintiff's allegations rely upon a broad interpretation of what constitutes "interest" under New York state law. Plaintiff's primary argument in support of its position that the Agreement charges interest at a rate in excess of 25% is premised on its reading of the New York Court of Appeals' decision in <u>Adar Bays, LLC v. GeneSYS ID, Inc.</u>, in which the Court of Appeals held that, "under New York law, if a lender will receive something of value in exchange for a loan based on a contingency, that contingent payment may constitute interest for purposes of the usury statutes." 37 N.Y.3d 320, 341-42 (2021). Plaintiff contends that this decision affirmatively establishes that, under New York law, "the value of property exchanged in consideration for a loan 'should be included in determining the loan's interest rate for purposes of the usury statutes[.]'" ECF No. 51 ("Opp.") at 8 (quoting <u>Adar Bays</u>, 37 N.Y.3d at 334). Defendants, however, assert that plaintiffs read <u>Adar Bays</u> far too broadly, contending that the opinion held only that <u>floating-price conversion options</u>, the instruments at issue in the <u>Adar Bays</u> case, were not too speculative to constitute interest. ECF No. 56 ("Reply") at 4.

Before engaging with the parties' arguments, it is necessary to provide a brief summary of the underlying facts of <u>Adar Bays</u>. The case concerned an agreement pursuant to which the plaintiff, Adar Bays, loaned the defendant, GeneSYS, $35,000, in exchange for

a note with 8% interest that would mature in one year.  37 N.Y.3d at 324.  The note included an option for Adar Bays to convert some or all of the debt into shares of GeneSYS stock at a discount of 35% from the lowest trading price over the 20 days prior to the date on which Adar Bays requested a conversion.  <u>Id.</u>  Adar Bays was permitted to exercise its option starting 180 days after the note was issued and could do so all at once or in separate partial conversions.  <u>Id.</u>[18]  The district court initially held that the value of this conversion option did not need to be added to the note's stated interest rate because its value was "simply too uncertain at the time of contracting."  <u>Adar Bays, LLC v. GeneSYS ID, Inc.,</u> 341 F. Supp. 3d 339, 356 (S.D.N.Y. 2018).  In reviewing the district court's decision on appeal, the Second Circuit certified two questions to the New York Court of Appeals, namely:

  1. "Whether a stock conversion option that permits a lender, in its sole discretion, to convert any outstanding balance to shares of stock at a fixed discount should be treated as interest for the purposes of determining whether the transaction violates N.Y. Penal Law § 190.40, the criminal usury law"; and

_____

[18]    The note also included other provisions favorable to Adar Bays, including that: (i) if GeneSYS prepaid the note within the first 180 days, prepayment would incur significant penalties exceeding 100% of the face of the note; (ii) after Adar Bays' conversion right ripened, prepayment was prohibited; (iii) if GeneSYS went bankrupt or failed to maintain current filings with the SEC, the interest rate would increase to "24 percent per annum or, if such a rate is usurious . . . then at the highest rate of interest permitted by law" and (iv) if GeneSYS were delisted from any stock exchange, the principal would increase by 50%; and (v) if Adar Bays lost its bid price in a stock market, the principal would increase by 20%.  <u>Adar Bays</u>, 37 N.Y. 3d at 324.

-16-

    2. "If the interest charged on a loan is determined to be criminally usurious under N.Y. Penal Law § 190.40, whether the contract is <u>void ab initio</u> pursuant to N.Y. Gen. Oblig. Law § 5-511."

<u>Adar Bays, LLC v. GeneSYS ID, Inc.</u>, 962 F.3d 86, 94 (2d Cir. 2020).

The New York Court of Appeals answered both questions in the affirmative, <u>see</u> <u>Adar Bays</u>, 37 N.Y.3d at 323-24, holding that, although the "future exercise of a floating price-conversion option" did not "render a loan usurious on its face," it was "an intrinsic part of the consideration Adar Bays received for the loan[,]" <u>id.</u> at 335.[19]  The Court further determined that the value of property exchanged in consideration for a loan "should be included in determining the loan's interest rate for purposes of the usury statutes, to the extent such value, when measured at the time of contracting, can be reasonably determined."  <u>Id.</u> at 334.

The agreement at issue in this action is markedly different from the one in <u>Adar Bays</u>.  Here, the Agreement provides for the payment of certain costs, fees, expenses, and returns based on collections from loan portfolios purchased with the proceeds of the promissory notes executed under the Agreement.  These collections are distributed in accordance with a pre-set schedule, which first requires the collections to be used to pay costs, fees,

---

[19]  The Court also held that "loans proved to violate the criminal usury statute are subject to the same consequence as any other usurious loans: complete invalidity of the loan instrument."  <u>Adar Bays</u>, 27 N.Y.3d at 333.

and other expenses, including Servicing Fees and Due Diligence Expenses.  See Loan Agreement § 3.3.  The first distributions under this schedule are paid to Steel River, the borrower, as reimbursement for costs incurred in servicing the accounts, and to Greenhill, as Manager of the Agreement.  Id. § 3.3(i).  Under New York state law, "a borrower may pay all reasonable expenses incurred by the lender in making the loan without rendering the loan usurious."  Union Capital LLC v. Vape Holdings Inc., No. 16 Civ. 1343 (RJS), 2017 WL 1406278, at *5 (S.D.N.Y. Mar. 31, 2017) (quoting Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank, 652 F. Supp. 101, 105 (E.D.N.Y. 1986)).

Once all initial fees and expenses are paid, Loan Agreement §§ 3.3(i)-(iv)(A), the remaining collections are paid as Preferred Return to Variant and Pier, id. § 3.3(iv)(B).  Each promissory note provides for a 115% Preferred Return.  See, e.g., Promissory Note dated Dec. 22, 2022 at 6.  As defendants note, this Preferred Return is well below the 25% criminal usury rate.  Mot. at 6, n.4.  Only after payment of all fees and expenses and complete satisfaction of the Preferred Return Amount is an Additional Preferred Return paid pursuant to the schedule in Section 3.3, at which point the remaining collections are paid 75% to Variant and 25% to Greenhill until the note's Stated Maturity Date.  Loan Agreement § 3.3(iv)(B).

The primary question for this Court, as determined in Adar Bays, is whether the value of the property exchanged by the parties in consideration for the amount advanced under the Agreement, "when measured at the time of contracting, can be reasonably determined." 27 N.Y.3d at 334. As stated above, the Agreement first provides for reimbursement of fees and expenses to Steel River, which need not be considered because they do not flow to the lenders, and then for reimbursement of fees and expenses to Variant and Greenhill. Loan Agreement § 3.3(i)-(iv)(A). The Agreement then provides for payment of remaining collections to Variant and Pier until the Preferred Return amount of 115% of the principal is paid in full. Loan Agreement § 3.3(iv)(B). After payment of the Preferred Return, the Agreement provides for an Additional Preferred Return, or payment of an additional percentage of the remaining collections to Variant and Greenhill until the stated maturity date for the Note. Id. There is no minimum Additional Preferred Return, and payment of the Additional Preferred Return is entirely contingent on payment of all necessary fees, costs, and expenses, as well as prior satisfaction of the Preferred Return Amount and the continued collection of receipts from the loan portfolio.

As indicated by the Agreement's use of percentages rather than fixed amounts to distribute the Additional Preferred Return,

-19-

the parties expected these payments to fluctuate.  Moreover, in entering into the Agreement, defendants accepted the risk that their return might not amount to anything beyond the 115% Preferred Return.  See Adar Bays, 37 N.Y.3d at 334-35 ("[P]arties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders, not investors[,]" as such exposure indicates "the sort of . . . risk an equity investor or joint venturer would bear[.]").[20]  Accordingly, beyond the Preferred Return, which was set at the time of contracting and provides for a rate of interest that is indisputably below New York's 25% criminal usury cap, any amounts that the lenders might earn under the Agreement after reimbursement of costs, fees, and expenses, and payment of the Preferred Return could not have been reasonably determined at the time of contracting.  See, e.g., Colonial Funding Network Inc. v. Epazz, Inc., 252 F. Supp. 3d 274, 281 (S.D.N.Y. 2017) (agreement was not usurious where future receipts where not "payable absolutely" but dependent "upon a crucial contingency: the continued collection of receipts by [the borrower] from its customers").

---

[20]    The parties' expectation that the gross collection amounts would fluctuate is reflected in the Loan Agreement, which, for example, provides for the provision of a Cash Reconciliation Report to Variant each month showing the status of collections for each account purchased under the Agreement.  See Loan Agreement § 7.1(e).

Plaintiff asserts that the cases cited by defendants in support of their position that these additional fees, costs, and expenses and Additional Preferred Return amounts should not be included in the calculation of interest under the Agreement "reflect principles that are no longer valid under current New York law" following Adar Bays. Opp. at 9. However, notably, plaintiff does not cite a single post-Adar Bays case in which a court determined that an agreement contained a criminally usurious rate of interest where it provided for payments to the lender based on a percentage of the collections from loan portfolios purchased with the proceeds of that agreement. Rather, each post-Adar Bays case cited by plaintiff in support of its argument concerns a conversion option, the same instrument at issue in Adar Bays, which is wholly distinct from the Agreement in this action. See, e.g., id. (citing Golock Capital, LLC v. VNUE, Inc., No. 21 Civ. 8103 (DLC), 2023 WL 3750333, at *7 (S.D.N.Y. June 1, 2023), aff'd DBW Invs., LLC v. VNUE Inc., No. 23-857, 2024 WL 2524033 (2d Cir. May 24, 2024) (conversion option with discounted rate should be included in calculating interest); id. at 10-11 (citing EMA Fin., LLC v. Chancis, 80 F.4th 395, 405 (2d Cir. 2023) (floating-rate conversion option should be included in calculating interest for purposes of determining whether notes at issue were usurious)).

Plaintiff further asserts that the value of such payments could have been reasonably determined at the time of contracting, contending that "the parties' projections are undisputable evidence of the valuation of the collection payments." Opp. at 10.  However, plaintiff states in its Complaint that these projections were intended to show "what [the parties] believed total collections would be on various purchased portfolios." Compl. ¶¶ 34-35.[21]  As stated above, the parties intended that these gross collections would be used to pay all the parties involved in the Agreement, including to reimburse Steel River for its costs, fees, and other expenses.  According, merely pointing to the projected "total collections" under the Agreement does not indicate that the Agreement's terms provided for a usurious rate of interest.

Plaintiff also cites Sections 3.5 and 10.2 of the Agreement, asserting that these sections provide that all amounts owed under

_____

[21]    We note that the parties shared these projections before entering into the Agreement, and plaintiff acknowledges that "[a]t all times, the projections reflected that Variant and Pier would receive interest well in excess of 25% of every loan[.]"  Compl. ¶¶ 34-35.  Thus, plaintiff, a sophisticated entity specializing in debt collection, was well aware of what it would owe under the Agreement at the time it was entered into.

In its Opposition, plaintiff cites Adar Bays and a 9th Circuit case addressing warrants for the proposition that projections can be used "to construct a reasonable valuation of an investment having a contingent component."  See Opp. at 10 (quoting Adar Bays, 37 N.Y.3d at 340-41; Custom Chrome, Inc. v. Commissioner of Internal Revenue, 217 F.3d 1117, 1123-26 (9th Cir. 2000)).  However, as noted above, both cases cited by plaintiff concerned very different financial instruments.

-22-

the agreement would be accelerated and become immediately due and
payable if Steel River "did not satisfy projected targets." Opp.
at 11.  However, this characterization of the Agreement is
misleading, as neither of the cited provisions refers to "projected
targets."  Section 3.5 provides that Steel River "may not pay or
prepay any Loan in whole or in part other than from Net Collections
during the Collection Period and in accordance with this
Agreement."  Loan Agreement § 3.5.  Section 10.2, by contrast,
addresses the effect of an event of default, stating that "all
Loans, all unpaid principal and other amounts owing under the Loan
Documents shall immediately and automatically be accelerated and
become due and payable" upon occurrence of an event of default.
Id. § 10.2.

We note also that Section 10.1 lists the types of events that
constitute events of default under the Agreement, id. § 10.1,
including "[f]ailure to . . . make any payment on any Distribution
Date[,]" id. § 10.1(a), and "[f]ailure . . . to observe or perform
any term, covenant, or agreement contained in Articles III, IV,
VII or VIII hereof[,]" id. § 10.1(c).  None of these events of
default in Section 10.1 includes a failure to meet specific
"projected targets."  Moreover, as defendants note, the Notice of
Default sent by defendants in advance of the UCC lien stated that
it was provided pursuant to Sections 10.1(b) and 10.1(g), which

list as events of default: (i) the making of "false, misleading, incomplete or untrue" representations or warranties by Steel River; and (ii) circumstances which would be reasonably expected to have a material adverse effect on Steel River's condition or its ability to perform its obligations under the Agreement. Compl., Ex. C at 3.  Neither provision includes any reference to Steel River's failure to meet projected collection targets, and Variant cited in its Notice of Default the existence of certain operational and documentation deficiencies in connection with Steel River's role as servicer of the loan portfolios.  Id. at 2-3.

In sum, plaintiff has failed to demonstrate that the parties' Agreement is criminally usurious.  Accordingly, defendants' motion to dismiss plaintiff's UCC claim is granted.  See Colonial Funding Network Inc., 252 F. Supp. 3d at 281 (S.D.N.Y. 2017) (determining that the parties' agreement was not usurious where future receipts were "not payable absolutely" but dependent "upon a crucial contingency: the continued collection of receipts by [the borrower] from its customers").[22]

_____

[22]    Given our determination that the parties' Agreement was not criminally usurious, we need not reach defendants' argument that New York General Obligations Law ("G.O.L.") § 5-501(6)(b) precludes Steel River's claims entirely because the total amount loaned was more than $2.5 million.  Mot. at 10-12. However, we note that it is quite plausible that Steel River's claims may be precluded on this basis, given that the very first promissory note was for $2,418,797.84, and the Agreement clearly contemplated the provision of

### b. The RICO Claim

Plaintiff next asserts a RICO claim against defendants, alleging violations of 18 U.S.C. §§ 1962(c)[23] and (d)[24]. For the reasons that follow, plaintiff's RICO claim is dismissed in its entirety. Compl. ¶¶ 64-99.

Congress enacted RICO in 1970, in an effort to "eradicate[e] . . . organized crime in the United States." Am. Fed'n of State,

---

additional funds in successive promissory notes. See, e.g., In re 16th Street Regency LLC, Case No. 14-46104 (NHL), 2018 WL 4219179, at *6 (Bankr. E.D.N.Y. Sept. 4, 2018) (aggregating loans for purposes of N.Y. G.O.L. § 5-501(6)(b) where they were made pursuant to separate documents but the Agreement indicated the initial loan was "one part of a larger aggregate loan" and the "loan agreements [we]re, in essence, identical apart from the lenders' names and amounts loaned"). However, given the uncertainty regarding the permissibility of aggregation, see, e.g., In re BH Sutton Mezz LLC, Case No. 16-10455 (SHL), 2016 WL 8352445, at *36-37 (Bankr. S.D.N.Y. Dec. 1, 2016), we do not reach defendants' argument at this time.

We note only that the Second Circuit has suggested in dicta that this statute, N.Y. G.O.L. § 5-501(6)(b), was intended for precisely this situation, in which sophisticated parties bargained for an agreement involving a loan amount totaling more than $2.5 million, far larger than the sum advanced in a typical transaction to a less sophisticated party. See In re Venture Mortgage Fund, L.P., 282 F.3d 185, 189 (2d Cir. 2002) ("[N]o New York usury law prohibits, voids, or regulates transactions over $2.5 million, a financial plane above which all players apparently are deemed to be able to fend for themselves."); NML Capital v. Republic of Argentina, 621 F.3d 230, 238-39 (2d Cir. 2010) ("[W]e cannot conclude that the legislature's intent was anything other than to permit parties negotiating the terms applicable to the borrowing and repayment of sums of $2.5 million or more to choose to incorporate interest rates higher than 25%."). Here, plaintiff was undoubtedly a sophisticated party familiar with lending instruments and more than able to "fend for [itself]." In re Venture Mortgage Fund, L.P., 282 F.3d at 189.

[23]  18 U.S.C. § 1962(c) prohibits "any person employed by or associated with any enterprise . . . [from] conduct[ing] or participat[ing], directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity."

[24]  18 U.S.C. § 1962(d) prohibits an individual from "conspir[ing] to violate" the other subsections of § 1962.

Cnty. & Mun. Emp. Dist. Council 37 Health & Sec. Plan v. Bristol-Myers Squibb Co., 948 F. Supp. 2d 338, 344 (S.D.N.Y. 2013) (citing Pub. L. No. 91-452 (1970)).  The statue focuses on "racketeering activity," a term that "encompass[es] dozens of state and federal offenses" that serve as punishable predicate acts.  RJR Nabisco, Inc. v. European Cmty., 579 U.S. 325, 329-30 (2016).  RICO also establishes a private civil cause of action for individuals who are harmed by racketeering activity.  See 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court[.]").

"'To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962.'"  Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 120 (2d Cir. 2013) (quoting DeFalco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001) (quotation marks omitted)).  Further, to establish a violation of § 1962(c), a complaint must allege that the defendant engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity[,]" id. at 120, or "through . . . collection of unlawful debt[,]" id. at 120, n.1.

"Racketeering activity," for purposes of RICO, includes "any 'act' indictable under various specified federal statutes,

including the mail and wire fraud statutes[.]"  Kim v. Kimm, 884
F.3d 98, 103 (2d Cir. 2018) (citing 18 U.S.C. § 1961(1)).  "A RICO
claim must allege every essential element of each predicate act."
Lateral Recovery LLC v. Queen Funding, LLC, No. 21 Civ. 9607 (LGS),
2022 WL 2829913, at *2 (S.D.N.Y. July 20, 2022) (citation omitted).

Here, plaintiffs contend that defendants violated RICO and
engaged in a RICO conspiracy under two theories: (i) through the
collection of unlawful debt; and (ii) by engaging in a pattern of
racketeering activity based on wire fraud and the interstate
transportation of stolen money through the operation of an
enterprise that collected debt at criminally usurious rates.
Compl. ¶¶ 64-99.  Given our determination that plaintiff has not
established that the parties' agreement violated New York's
criminal usury laws, plaintiff has also failed to allege that
defendants engaged in the collection of unlawful debt.  Plaintiffs
will not be permitted to simply convert their unsuccessful UCC
claim into a RICO claim.  However, for the sake of completeness,
we address each element of their RICO claim below.

### i. Collection of Unlawful Debt

To state a RICO claim premised on the collection of an
unlawful debt, a plaintiff must allege that: (1) "the debt was
unenforceable in whole or in part because of state or federal laws
relating to usury"; (2) "the debt was incurred in connection with

'the business of lending money . . . at a [usurious] rate'"; and (3) "the usurious rate was at least twice the enforceable rate[.]" Dae Hyuk Kwon v. Santander Consumer USA, 742 F. App'x 537, 539 (2d Cir. 2018) (citations omitted).

Because RICO's "definition of 'unlawful debt' invokes state as well as federal laws related to usury[,]" we must first determine which state's law is applicable in this action. United States v. Moseley, 980 F.3d 9, 18 (2d Cir. 2020). The Agreement explicitly states that New York state law will govern its terms. Loan Agreement § 12.14. Accordingly, for purposes of RICO liability, New York law governs the issues of whether the agreement at issue must be considered criminally usurious and unenforceable. See Haymount Urgent Care PC v. GoFund Advance, LLC, 609 F. Supp.3d 237, 246 (S.D.N.Y. 2022) (applying New York law where agreements at issue "expressly choose that New York law will govern their terms").

As stated supra, Section I.a., plaintiff has failed to allege that the Agreement provided for a criminally usurious rate of interest under New York state law. Moreover, even if plaintiff had so alleged, as discussed infra, plaintiff has failed to plead the remaining necessary elements of a RICO claim. See Dae Hyuk Kwon, 742 F. App'x at 539-40 (affirming dismissal of RICO claim based on collection of unlawful debt where plaintiff failed to

allege interest rate was at least twice the enforceable rate under New York state law).

### ii. Wire Fraud and Interstate Transportation of Stolen Money

We next address plaintiff's claim that defendants engaged in predicate acts of wire fraud.  "[W]here . . . the predicate acts on which a RICO claim is based sound in fraud, those acts must be pleaded in conformity with Rule 9(b)'s heightened pleading standard."  BWP Media USA Inc. v. Hollywood Fan Sites, LLC, 69 F. Supp. 3d 342, 362 (S.D.N.Y. 2014) (quoting Continental Petroleum Corp., Inc. v. Corp. Funding Partners, LLC, No. 11 Civ. 7801 (PAE), 2012 WL 1231775, at *4 (S.D.N.Y. Apr. 12, 2012)).

Rule 9(b) of the Federal Rules of Civil Procedure requires that, "a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "In order to comply with Rule 9(b), a complaint alleging fraud 'must: [i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent.'"  BWP Media USA Inc., 69 F. Supp. 3d at 362 (quoting Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks omitted)).  Further, where "a complaint contains allegations of fraud against multiple defendants, the

plaintiff must plead facts that describe each defendant's involvement in the fraud." Id. (internal quotation marks and citations omitted). "Given the routine use of mail and wire communications in business operations, . . . 'RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'" Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 489 (2d Cir. 2014) (quoting Efron v. Embassy Suites (Puerto Rico), Inc., 223 F.3d 12, 20 (1st Cir. 2000), cert. denied, 532 U.S. 905 (2001)).

Plaintiff's complaint fails to satisfy Rule 9(b)'s heightened pleading standard. Plaintiff alleges no specific predicate acts of wire fraud, stating only that the alleged enterprise "originate[d], underwr[o]te, fund[ed], service[d], and collect[ed] upon the usurious loans [it] made . . . to entities in Illinois and through the United States via extensive use of emails, mail, wire transfers and bank withdrawals processed through an automated clearing house." Compl. ¶ 91. These allegations fail to identify even the basic facts necessary to support a RICO claim, including the participants in any relevant agreements or communications. See Entretelas Americanas S.A. v. Soler, No. 19 Civ. 3658 (LAK) (RWL), 2020 WL 9815186, at *8 (S.D.N.Y. Feb. 3, 2020), aff'd, 840

F. App'x 601 (2d Cir. 2020), <u>as amended</u> (Jan. 7, 2021) (dismissing claim for mail and wire fraud where the complaint "contain[ed] no particular examples of mail or wire fraud" and "d[id] not allege the essential elements of mail or wire fraud, namely that [defendant] had an intent to defraud, who precisely was defrauded, or what detrimental reliance resulted from the allegedly false statements").

We next address plaintiff's allegation that defendants engaged in the predicate act of interstate transportation of stolen property in violation of 18 U.S.C. § 2314, which prohibits, <u>inter alia</u>, the interstate transportation of stolen goods or money valued at $5,000 or more. Compl. ¶ 84. To prove a violation of Section 2314, a plaintiff must show that: (i) the defendant transported property in interstate commerce; (ii) the property was worth $5,000 or more; and (iii) the defendant knew the property was stolen, converted, or taken by fraud. <u>Dowling v. United States</u>, 473 U.S. 207, 214 (1985). Where, as here, allegations of interstate transport of stolen property allege that the property has been taken by fraud, the allegations must also meet the heightened requirement of Rule 9(b). <u>See</u> <u>Kades v. Organic Inc.</u>, No. 00 Civ. 3671 (LTS) (RTE), 2003 WL 470331, at *9 (S.D.N.Y. Feb. 24, 2003) (allegations of transportation of stolen property must be pleaded with particularity).

The complaint alleges that the defendants, as members of a RICO enterprise, "had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of transporting fraudulently-obtained money interstate." Compl. ¶ 83. Once again, plaintiff provides little detail to support its claim, vaguely alleging only that defendants "shared personnel and/or one or more contracts or agreements relating to" the transportation of stolen money across state lines. Id. Without more, these vague and conclusory allegations do not suffice to establish all three elements of 18 U.S.C. § 2314, or to meet the heightened pleading requirements of Fed. R. Civ. P. 9(b). See Kades, 2003 WL 470331, at *9 (dismissing RICO claim involving interstate transport of stolen property where plaintiff failed to allege specific facts relating to the three elements of a violation of 18 U.S.C. § 2314).

### iii. Pattern of Racketeering Activity and Existence of a Racketeering Enterprise

Finally, even if plaintiff had properly alleged the existence of one or more predicate acts, plaintiff has wholly failed to demonstrate that defendants engaged in a "pattern of racketeering activity" or had any interest or control in a "racketeering enterprise[.]" 18 U.S.C. § 1962(c).

### 1. Pattern of Racketeering Activity

"A 'pattern of racketeering activity' consists of, inter alia, 'at least two acts of racketeering activity[.]'" Crawford, 758 F.3d at 487 (quoting 18 U.S.C. § 1961(5)).  A civil RICO plaintiff "must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  Id. (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989) (emphasis in original)).  "The requisite continuity may be found in 'either an 'open-ended' pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time).'"  Id. at 487-88 (quoting GICC Cap. Corp. v. Tech. Fin. Grp., 67 F.3d 463, 466 (2d Cir. 1995)).  Notably, the Second Circuit "has never held a period of less than two years to constitute a substantial period of time[.]" Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999) (internal quotation marks and citation omitted).[25]

---

[25]    Although this two-year time frame is not a strict requirement, the Second Circuit has stated that "it will be rare that conduct persisting for a shorter period of time [than two years] establishes closed-ended continuity, particularly where . . . the activities alleged involved only a handful of participants and do not involve a complex, multifaceted conspiracy." Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 184 (2d Cir. 2008) (internal quotation marks and citation omitted).

For the reasons stated above, Steel River has failed to sufficiently allege that defendants engaged in unlawful debt collection, wire fraud, or interstate transportation of stolen money. Moreover, even if Steel River had sufficiently alleged that defendants engaged in the collection of unlawful debt, its complaint addresses only one lending transaction with one borrower and fails to allege the "'number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes that are the hallmark of both participants and victims, and the presence of separate schemes' that are the hallmark of a pattern of racketeering activity and that is necessary to make out a Section 1962(c) RICO claim." Wade Park Land Holdings, LLC v. Kalikow, 589 F. Supp. 3d 335, 383 (S.D.N.Y. 2022) (citing Cofacredit, 187 F.3d at 242); see also CPF Premium Funding, Inc. v. Ferrarini, No. 95 Civ. 4621 (CSH), 1997 WL 158361, at *9 (S.D.N.Y. Apr. 3, 1997) (thirty-five specific acts of misconduct carried out against the same victim did not establish closed-ended continuity required under RICO).[26]

---

[26]    To the extent Steel River attempts to argue that a "pattern of racketeering activity" is not required if it can show that defendants engaged in the collection of unlawful debt, courts in this District have previously held that RICO "does not reach the collection of a loan that is made occasionally and not as part of the business of lending money at a usurious rate," see Fleetwood Services, LLC v. Ram Capital Funding LLC, No. 20 Civ. 5120 (LJL), 2022 WL 1997207, at *18 (S.D.N.Y. June 6, 2022) (internal quotations and citation omitted).  While the Complaint alleges that Greenhill "orchestrated a similar usurious loan between an entity named Reel Time Capital and a foreign lender, CSM Securities[,]" and that, "[u]pon information and belief, Variant

## 2. Existence of a Racketeering Enterprise

18 U.S.C. § 1961(4) defines the term "enterprise" as "any individual, partnership, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." An enterprise is "an entity separate and apart from the pattern of activity in which it engages." United States v. Turkette, 452 U.S. 576, 583 (1981).

The Second Circuit has held that an association of individuals can form a RICO enterprise if they "share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." D. Penguin Bros. v. City Nat. Bank, 587 F. App'x 663, 668 (2d Cir. 2014) (summary order) (internal quotation and citation omitted). "[C]onclusory naming of a string of entities does not adequately allege an enterprise." First Cap. Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 175 (2d Cir. 2004) (internal quotation marks omitted).

Plaintiff alleges that the RICO enterprise at issue in this case consisted of all three defendants, Variant, Pier, and Greenhill, claiming that they are "associated in fact for the

---

has made loans to companies in other industries which may be usurious and unlawful[,]" Compl. ¶¶ 78-79, these vague allegations involving individual defendants are insufficient to establish that all three defendants, as a group, are engaged in the business of lending money at a usurious rate over a substantial period of time.

common purpose of carrying on an ongoing unlawful enterprise" with the "goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at ma[n]y multiples above the enforceable rate under the laws of New York and other states." Compl. ¶¶ 74-75.

However, for the reasons stated above, the Complaint does not "plausibly support the inference that the defendants were collectively trying to make money . . . by fraud[.]" Wade Park Land Holdings, 589 F. Supp. 3d at 361.[27]  Moreover, even if plaintiff had sufficiently pled the existence of a common purpose to engage in fraudulent conduct, plaintiff still fails to allege that defendants "as a group formed an ongoing organization." Id. at 375 (citing Democratic Nat'l Comm. v. Russian Fed'n, 392 F. Supp. 3d 410, 439 (S.D.N.Y. 2019) (holding that RICO enterprise was not plausibly alleged where plaintiff's "allegations provide no basis to infer either that the alleged [enterprise] members formed an ongoing organization or that the defendants formed a

---

[27]    Plaintiff alleges only that "[Greenhill], in particular, is no stranger to conspiring with lenders to arrange for, and profit from, usurious loans" and "orchestrated a similar usurious loan" for a different entity, and that "Variant has made loans to companies in other industries which may be usurious and unlawful." Compl. ¶¶ 77-79.  The Complaint contains no additional detail regarding these allegations, or why all three defendants' actions suffice to establish the existence of a larger enterprise.  Such allegations, without more, fail to satisfy the minimum pleading standards.  See US Info. Grp. LLC v. EBF Holdings, LLC, No. 22 Civ. 6661 (PKC), 2023 WL 6198803, at *11-12 (S.D.N.Y. Sept. 22, 2023) (dismissing civil RICO claim where plaintiff's allegations were made "on information and belief" and did not contain supporting facts).

-36-

coherent entity that was separate and apart from the predicate
acts that allegedly comprise the alleged fraudulent scheme")).
Plaintiff's allegations merely describe the actions of the various
defendants in connection with the Agreement executed with Steel
River.  Compl. ¶¶ 74-89.  The Complaint fails to include specific
"information on the group's organization or hierarchy[,]" BWP
Media USA, 69 F. Supp. 3d at 360, or how the enterprise operated
"separate and apart from the predicate acts that allegedly
comprise[d] the alleged fraudulent scheme[,]" Democratic Nat'l
Comm., 392 F. Supp. 3d at 439 (citations omitted).[28]

Accordingly, plaintiff has failed to plead the existence of
a RICO enterprise, which is "'[t]he heart of any civil RICO
claim[.]'"  BWP Media USA, 392 F. Supp. 3d at 359 (quoting D.
Penguin Bros. v. City Nat'l Bank, Nos. 13 Civ. 0041, 13 Civ. 706
(TPG), 2014 WL 982859, at *4 (S.D.N.Y. Mar. 11, 2014)).

In sum, plaintiff has not pled any element of its RICO claim.
As a result, plaintiff's RICO claim must be dismissed.

---

[28]   While the complaint names three individuals as "principals of the
Enterprise[,]" Compl. ¶ 86, it fails to explain their involvement with the
defendants in this action using the necessary specifics, stating only that these
individuals "are responsible for the day-to-day operations of the Enterprise
and have the final say on all business decisions of the Enterprise" and "are
responsible for creating, approving and implementing the policies, practices
and instrumentalities used by the Enterprise to accomplish its goals and
purposes," id.  Moreover, none of these three individuals are named as
individual defendants in this action.

### c. The Declaratory Judgment Claim

Plaintiff also seeks a declaration pursuant to 28 U.S.C. § 2201 that Variant's UCC lien filing is void due to the usurious nature of the parties' Agreement.  Compl. ¶¶ 108-15.

In determining whether to grant declaratory relief, a court must consider: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty."  Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005) (citation omitted).  "Courts reject declaratory judgment claims 'when other claims in the suit will resolve the same issues,' because, under such circumstances, a declaratory judgment will not serve any useful purpose."  See Optanix, Inc. v. Alorica, Inc., 20 Civ. 9660 (GHW), 2021 WL 2810060, at *3 (S.D.N.Y. July 6, 2021) (quoting EFG Bank AG v. AXA Equitable Life Ins. Co., 309 F. Supp. 3d 89, 99 (S.D.N.Y. 2018) (citation omitted)); see also Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co., 52 F. Supp. 3d 601, 623 (S.D.N.Y. 2014), aff'd sub nom. Maria Re Ltd. ex rel. Varga v. Am. Fam. Mut. Ins. Co., 607 F. App'x 123 (2d Cir. 2015) ("[D]eclaratory relief in this case would be wholly superfluous, as the resolution of [plaintiff's] other claims . . . 'settle[s] the issues for which declaratory judgment is sought.'") (citation omitted).

-38-

Because plaintiff's declaratory judgment claim is duplicative of its claim under N.Y. UCC § 9-625(a), plaintiff's claim is dismissed.  See Optanix, Inc., 2021 WL 2810060 at *4 (dismissing plaintiff's declaratory judgment as duplicative of breach of contract claim).

## II. Preliminary Injunction

Finally, we address plaintiff's outstanding motion for a preliminary injunction to enjoin defendants from enforcing or collecting on the Agreement, including under the UCC.  ECF Nos. 3-5.

A motion for preliminary injunction may be granted if a plaintiff has established: "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest."  N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018) (citing New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015)).

Here, the basis for plaintiff's motion for a preliminary injunction is the assertion that they are likely to succeed on the merits of their claims against defendants.  Given the Court's determination that the Agreement at issue in this action is not criminally usurious under New York law and its dismissal of all

plaintiff's underlying claims, plaintiff's motion for a preliminary injunction must also be denied.  See Marshall v. Nat'l Ass'n of Letter Carriers BR36, No. 02 Civ. 1754 (LTS) (AJP), 2004 WL 2202574, at *5 (S.D.N.Y. Sept. 30, 2004) ("[B]ecause the underlying claim[s are] being dismissed, [p]laintiff cannot establish the necessary prerequisites for grant of a motion for preliminary injunction, specifically that the party seeking the injunction is likely to succeed on the merits or that there are sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the moving party.") (citation omitted).

## CONCLUSION

For the foregoing reasons, this Court denies plaintiff's motion for a preliminary injunction and dismisses plaintiff's complaint in its entirety.  The Clerk of Court is respectfully directed to terminate all pending motions and close this case.[29]

**SO ORDERED.**

Dated:   New York, New York
         September 3, 2025.

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[29]   The Court understands that the parties have requested oral argument.  Mot. at 1; Opp. at 1.   However, given that our holding is based on clear legal doctrine, the Court has determined that oral argument would not be productive.

-40-